12864

CATAWBA FERTILIZER CO. v. GIBSON *ET AL.*

(152 S. E., 729)

April, 1929.

464

466

468

*Messrs. R. L. Douglas,* and *H. M. Lightsey,* for appellants,

*Mr. James H. Glenn,* for respondent,

March 22, 1930.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

. In the spring of 1925, the defendant E. W. Gibson effected a loan from the South Carolina Agricultural Loan Association (hereinafter referred to as the "Association"), of $14,500, for his farming operations during that year; the loan was secured by a real estate mortgage upon 4,000 acres of land, a mortgage upon the crop of 1925, and a chattel mortgage upon 50 mules and 4 horses; it was due November 1, 1925; it appears that at the maturity of the obligation,

Gibson had paid nothing upon the principal; I assume that the interest was provided for.

In the spring of the following year, 1926, Gibson effected a second loan from the Association of $6,262, for his operations during that year. It appears that the total indebtedness then was consolidated into a new paper for $20,762.50, made up of the original debt of $14,500, and the new loan, $6,262.50, which was secured by a mortgage upon the 4,000 acres, a mortgage upon the crop of 1926, and a chattel mortgage upon the same live stock. These obligations fell due on November 1, 1926, at which time Gibson had paid upon them a little less than $6,000, leaving a balance due and unpaid of $15,006.06.

It appears, strange to say, that the 4,000 acres of land which normally would be expected to constitute the main reliance of the Association for security was incumbered by prior mortgages which, being foreclosed, and the lands sold, realized nothing to the Association.

With a hopefulness upon the part of Gibson and of the Association which is remarkable, in the spring of the following year, 1927, Gibson effected a third loan from the Association of $6,500, for his operations during that year. Accordingly, he gave two notes to the Association on April 9, 1927; one for the balance then due upon his previous obligations, $15,006.06, and the other for the new loan, $6,500; each of these notes was secured by a mortgage upon the crop of 1927 and a chattel mortgage upon 44 mules and a horse, a part of the live stock already included in the other mortgages referred to above. They were recorded on April 12, 1927.

On April 29, 1927, Gibson effected a loan from the plaintiff, Catawba Fertilizer Company (hereinafter referred to as the Fertilizer Company), of $5,000 for which a note was given payable November 1, 1927, secured by a mortgage of the crop of 1927, nothing else, no mention being made of the live stock.

A matter which has not been explained needs notice: The mortgage to the Fertilizer Company was dated *April 29, 1927;* it covers, as stated, only the crop of 1927; no reference in that mortgage is made to the mortgages of *April 9, 1927,* to the Association, covering the same crop and securing the two notes of $6,500 and $15,006.06; and yet in the mortgage of $15,006.06, occurs this statement: "It is understood that this is a third mortgage over the crops, first being held by S. C. A. L. Association for $6,500 (the Association), and *second by Catawba Fertilizer Company for $5,000.00.*"

It must have been inserted in the $15,006.06 mortgage after its execution and record, probably as an inducement to the loan by the Fertilizer Company, as the former is dated *April 9,* and the latter *April 29.* There does not, however, appear to be any controversy over the fact that, as to the crop of 1927, the Association had the first lien for $6,500, the Fertilizer Company the second for $5,000, and the Association the third for $15,006.06, or that the Association had the first lien upon the live stock to the extent of $6,500 plus $15,006.06, $21,506.06.

In August, 1927, Gibson needed about $900 for the purpose of purchasing arsenate and a dusting machine with which to combat the boll weevil, and applied to the Fertilizer Company for it. In order to justify it in making the advance, and for their own protection, the Association and the Intermediate Credit Bank of Columbia (to which the mortgage had been assigned), executed an agreement in the form of a release, dated August 23, 1927, by which it was stipulated that the $15,006.06 mortgage should be subordinated to the advance to be made by the Fertilizer Company, "it being the intent and purport of this instrument to make the $900 a second mortgage, equal in rank to the one now held by the Catawba Fertilizer Company" for $5,000, on April 29, 1927, as above stated. It was also stipulated that the release agreement "shall in no manner affect the first mortgage covering

said crops heretofore executed by the said E. W. Gibson," dated April 9, 1927, to the Association, for $6,500.

Accordingly, the Fertilizer Company made the required advance amounting to $884.32 on August 25, 1927, and took a mortgage from Gibson upon the crop of 1927, and the dusting machine, making no mention of the live stock.

In the fall of 1927, the Association collected out of the crop upon which it had to that extent the first lien, the $6,500 mortgage in full; the Fertilizer Company, as the holder of the second lien upon the crop, collected $2,084.99, and as the holder of a mortgage upon the dusting machine $200. They applied the $200 last mentioned to the $884.32 mortgage for arsenate and machine, leaving $684.32 due thereon; of the $2,084.99 collected from the crop they paid off this balance of $684.32, leaving applicable to their $5,000 mortgage $1,-400.67 which left unpaid upon it $3,599.33 (making no allowance for interest).

In February, 1928, the Association foreclosed its chattel mortgage upon the live stock and realized from the sale $2,-025 which, with $600 from the co-operative Association on account of cotton in its hands belonging to Gibson, upon which the Fertilizer Company had no claim, the Association applied to the mortgage of $15,006.06, leaving a balance of over $12,000 unpaid.

Although the Fertilizer Company had a second lien upon the crop and a first lien upon the dusting machine, *with no lien upon the live stock,* and has received every dollar that it was entitled to, it attempts to maintain the extraordinary position that, under the two-fund doctrine, because the Association had a first lien to the extent of $6,500 upon the crop, and a first lien upon the live stock, it has the right to take from the Association the $2,025 proceeds of the sale of the live stock and apply it to the $3,500 balance unpaid upon its $5,000 note. In other words, although it had no lien upon the live stock at all, and the Association has not been paid by a large balance the amount of its mortgage, it

may appropriate money that belongs to the Association, for the purpose of paying a debt of Gibson for which it was in nowise responsible.

A simple illustration of the two-fund doctrine, as I understand it, is this: Jones has a mortgage upon two tracts of land, black-acre and white-acre, to secure a debt of $5,000; Brown has a mortgage upon black-acre alone to secure a debt of $3,000; it would be manifestly unfair to allow Jones to foreclose his mortgage upon black-acre and wipe out Brown's mortgage; so Brown has the right, without the slightest prejudice to Jones' rights to compel him to foreclose upon white-acre and leave black-acre for him. If it should be necessary in order to protect the full amount of Jones' mortgage that both tracts be sold, the Court will so order. In fact, the relief which Brown would be entitled to would be an order that Jones foreclose white-acre first, and if that sale did not satisfy his debt recourse could be had to the other tract.

Suppose the question had arisen before either the mortgage upon the crop or that upon the live stock had been realized upon; I do not think that there could be a doubt as to the right of the Fertilizer Company to force the Association in the first intance to exhaust the live stock upon which the Fertilizer Company had no lien, *before* resorting to the crops upon which it had a second lien. The position of the Fertilizer Company now, if sustained, would justify an order requiring the Association to proceed against the mules *and be content with the result of that chase.*

In *Bank v. Harbin*, 18 S. C., 425, the Court said:

"There is no dispute as to the general rule, that where there are two creditors of a common debtor, one of whom has a claim or lien upon two funds, and the other upon only one of these funds, that the latter has an equity to require the former, first to exhaust the fund upon which he has no claim or lien. The only qualification of this rule, laid down in the elementary writers, is that it will not apply where the creditor

having the lien upon the two funds will be injured or delayed by its application.   *   *   *

"There is no suggestion that its application would tend to injure or delay the creditors having liens on the two funds."

In *Bank v. Holliday*, 108 S. C., 116, 93 S. E., 333, 335, the Court said : "That two-fund doctrine rests upon equitable principles, and therefore it will not be allowed to defeat the equities of third persons over whom the parties invoking it have no superior equities.   *   *   *   In applying the rule, the maxim, '*Qui prior est in tempore potior est in jure,*' has peculiar force."

In *Davis v. Butler*, 107 S. C., 548, 93 S. E., 193 : "And while Davis & Son might have had the right to go into equity and require the Gin Company to exhaust the other property covered by the mortgage before coming upon the cotton sold them by Brown, yet, as this equity in their favor might have been doubtful, since the two-fund doctrine may not be applied by the Court where its application would result in too great prejudice to the rights of the senior lienee, or drive him to litigation, or a doubtful security.   *   *   *"

In *Wardlaw v. Troy Mill*, 74 S. C., 368, 54 S. E., 658, 660, 114 Am. St. Rep., 1004 : "The doctrine of marshaling being a rule of equity and having its foundation in principles of natural justice, its application will not be enforced when it would so operate as to work substantial injustice or injury to any party in interest. Thus marshaling will not be applied to the detriment of a third person having an equity equal or superior to that of the person seeking to invoke the rule."

In *Clark v. Wright*, 24 S. C., 526 : "It is, indeed, beset with difficulties, and we agree with the Circuit Judge, that it would not be just to Mrs. Wright, in enforcing a mere equity of others, to require her, against her protest, to embark in an expensive litigation, and to be 'delayed and inconvenienced in the collection of her debt.' In this respect, the case is somewhat like that of *Walker v. Covar* (2 S. C.,

20), in which the Court says: 'Such relief as is here asked is never granted, if the prior creditor is thereby endangered or his right to raise the money out of both funds the least impaired (citing several cases). Or where the fund to be resorted to is dubious, or one which may involve him in litigation, notwithstanding the claims of a junior creditor may be defeated thereby.' "

In *Witte v. Clarke*, 17 S. C., 313: "The rule requiring a creditor holding two liens to first exhaust that property on which a subsequent creditor has no lien, is inapplicable where its enforcement would operate to the prejudice of the prior creditor."

In *Walker v. Covar*, 2 S. C., 16: "The rule that a creditor having a lien on two funds may be compelled to resort, in the first instance, to the one on which the subsequent claim of another does not attach, is never applied where injustice may be done to the prior creditor.   *   *   * "

I think it is clear, therefore, that the position of the Fertilizer Company cannot be sustained under the two-fund doctrine.

The only other point that I think needs discussion is that under the release agreement the Association agreed that the mortgage of the Fertilizer Company for $884.32 should be paid prior to the payment of the $15,006.06 mortgage of the Association. In sustaining that contention, his Honor Judge Johnson in his order said: "It is probable that irrespective of the application of the two-fund doctrine, that this instrument alone would be sufficient to allow the plaintiff to recover the amount of its second mortgage of $884.32 before any sum could be paid upon the defendants' mortgage of $15,006.06. But when the instrument is considered, together with the conditions prevailing at the time of its execution, and in the light of the accepted doctrine of marshaling, the Court is clearly of the opinion that the plaintiff should recover its second mortgage from the defendant Association and Bank. There were no other funds

available with which this second mortgage of the plaintiff could be paid, except from the proceeds of the crop and stock. The Association's first mortgage has been paid in full from the crop sale. The plaintiff had received about $1,-500.00 from the crop upon its $5,000.00 mortgage. The defendant Bank has in hands the proceeds of the stock sale, which it has attempted to apply on the paper of $15,006.06. But by reason of the law of marshaling and by the terms of the instrument dated August 23rd, 1927, the Association and Bank both agreed that the plaintiff's second mortgage of $884.32 should be paid in full before payment of its $15,-006.06 mortgage. It is inevitable that the defendant Bank and Association must pay over to the plaintiff the amount of its second mortgage, $884.32, with interest, as therein provided. This is especially true in light of all the facts and circumstances of this case, considering that the plaintiff fur-. nished emergency money with which to fight boll weevils in August, and considering the terms and effect of the instrument then executed as qualifying the two-fund doctrine as applied by the Court to the claim of this plaintiff for full amount sued for."

As indicated above, it appears that out of the crop of 1927, after the Association's $6,500 mortgage upon it had been paid therefrom, the Fertilizer Company collected $200 from the sale of the dusting machine, and $2,084.99 from the crop. The $200 was applied as the Fertilizer Company had to do, to the $884.32 mortgage which reduced it to $684.32; the $2,084.99 received from the crop was applied to this balance, *paying the $884.32 mortgage in full.* The Association had therefore fully complied with its agreement that the $884.32 mortgage should be paid prior to payment upon the $15,006.06 mortgage.

Besides, what I think is absolutely conclusive of the matter, the release agreement referred solely, as its terms plainly show, *to the crop of 1927* and not to the live stock; that is to say that no part of the crop should be applied to the

$15,006.06 mortgage until the Fertilizer Company's mortgage for $884.32 should be paid. It did not purport to limit the efficacy of the $6,500 mortgage of the Association, and specifically so declared: *"and the same* (that is, the release agreement) *shall in no manner affect the first mortgage covering said crops heretofore executed by the said E. W. Gibson,"* that is, the $6,500 mortgage which all through the case is conceded to have been the first lien upon the crop. The Fertilizer Company was in no position to object to the application of the proceeds of the crop received by the Association sufficient to pay off the $6,500 mortgage. What remained after this payment was turned over to the Fertilizer Company, $2,084.99, as stated. Not a dollar of the crop proceeds was applied to the $15,006.06 mortgage, and hence it is evident that the Fertilizer Company has no ground of complaint. What the Fertilizer Company is contending for is that the Association applied the proceeds of the sale of the live stock, $2,025.00, to the large mortgage, proceeds to which it had no earthly claim.

That the release agreement referred only to the crop of 1927 and not to the live stock is apparent, not only for the reason that the Fertilizer Company had no claim upon the live stock, but from the very terms of the paper. It opens with the "whereas" that Gibson had executed a mortgage to the Association to secure the $15,006.06 debt, which by agreement had become the third mortgage "covering certain crops"—*no mention of live stock.* (Note.) There is liable to arise some confusion from the description of the Association's mortgage as *a third mortgage.* The reference is to the large mortgage as being the third mortgage. The fact is that the Association held the first mortgage of $6,500 on the crop which was not affected by the release agreement, as it specifically states. By agreement evidenced by the memorandum in the mortgage of April 9, 1927, above referred to, the priorities were fixed with reference to the mortgages upon the crop: 1. The Association's $6,500 mortgage; 2.

the fertilizer's $5,000 mortgage; and 3. the Association's $15,006.06 mortgage. (That is why the Association's mortgage is referred to as the third mortgage.)

The release agreement goes on to release the lien of the Association's mortgage on the *crop* for $15,006.06, in awarding priority to the $884.32 mortgage of the Fertilizer Company; and it provides: " * * * it being the purport of this instrument to make the $900 ($884.32 in fact), a second mortgage, *equal in rank to the one now held by the Catawba Fertilizer Company*," that is, the $5,000 mortgage which was specifically made second to the $6,500 mortgage of the Association as has been seen, showing that it was never the intention of the parties to create any convention affecting the mortgage upon the live stock.

For these reasons I think that the decree should be reversed, and the complaint dismissed. It is so ordered.

Msssrs. JUSTICES STABLER and CARTER concur.

MR. CHIEF JUSTICE WATTS and MR. JUSTICE BLEASE dissent.

MR. CHIEF JUSTICE WATTS (dissenting) : This is an action to enforce the application of the proceeds of the sale of certain mortgaged property to the payment of a mortgage from the defendant Gibson to the plaintiff. These mortgaged chattels had been sold by the defendant Association, and the proceeds of the sale applied on a certain mortgage for $15,006.06. But the said Association had by instrument in writing and by its conduct agreed that the plaintiff's mortgage of $884.32 should first be paid prior to the payment of the $15,006.06 mortgage.

This suit arises from the following facts:

The defendants, E. W. Gibson and E. W. Gibson, Jr., had been farming on a large scale and had become heavily involved. During the years 1925 and 1926, their farming operations were financed by the South Carolina Agricultural Loan Association, who rediscounted the Gibson notes secured by chattels and crop mortgage with the Federal Inter-

mediate Credit Bank of Columbia, S. C. By reason of unpaid balances from both years' operations, same amounting to approximately $15,000 at the end of the 1926 season, the Gibsons met with difficulty in financing 1927 farm operations. These balances had previously been secured by real estate mortgages upon lands of the Gibsons already mortgaged.

So that in the spring of 1927, in order to reduce the amount of its new advances to the Gibsons, the plaintiff at the instance of the Gibsons and at the solicitation of the defendants and relying upon certain statements of the officials of the Association and Bank, agreed to sell to the defendant Gibsons the guano needed to make the 1927 crop. The purchase price of this guano was to be paid in the fall. At the same time, the Association agreed to advance the Gibsons $6,500 of cash money needed for the 1927 farm operations. However, only $5,500 was actually advanced.

Testimony shows that the cash advances from the Association of $5,500 was secured by a first mortgage on the live stock and all crops of the Gibsons, and by pledge of some balance due from the marketing association on the 1925 cotton. The cost of the fertilizer was secured to the plaintiff by a mortgage on the crops alone, to be raised by the Gibsons in 1927, which mortgage was for $5,000. Next, the balances from the previous year, of $15,006.06, were merged and secured by a new second mortgage on the live stock and chattels, and by a third mortgage on the crops to the Association. While there was some irregularity in the dates of the recording, the rank of the several liens was fixed by contract in the various instruments.

During August, 1927, the Gibsons discovered that their cotton was on the point of being annihilated by the inroads of the boll weevil. Although it had a much larger amount at stake, the defendant Association would not extend further credit to the Gibsons for the purpose of fighting this pest and saving the crop for the benefit of itself and of the

Fertilizer Company, and incidentally for the Gibsons. So, again, we find the plaintiff, Catawba Fertilizer Company, coming to the rescue of the Gibsons and to the assistance of the Association and Bank by offering to furnish dusting machines and calcium arsenate to the extent of $884.32. And as an inducement to the plaintiff furnishing the much-needed implements and supplies to preserve the crop from this pest, the Association and Bank executed an instrument (Exhibit 2) by which instrument the Association and Bank agreed that "the said $900.00 hereinabove mentioned should be paid prior to the payment of the $15,006.06 mortgage."

Upon the execution and delivery of this instrument, immediate delivery of the dusting machines and calcium arsenate was made to the Gibsons for the purpose of saving their crop.

However, the Association and Bank had been tardy in furnishing supplies for the crop, the papers not being executed until April 29th of that year, so that there was a crop shortage. From the proceeds of the sale of cotton, the first mortgage was paid, and approximately $2,084.29 was paid on the plaintiff's mortgage. When it was ascertained that the crop was insufficient to pay the plaintiff's mortgage in full of $5,000, and its August mortgage of $884.32, the plaintiff demanded that the defendant Association and Bank sell the live stock and that the proceeds of the live stock be applied according to contract. This it refused to do, and thereupon this action was brought.

During the progress of the trial, the plaintiff introduced in evidence the waiver (Exhibit E) as a part of its proof. The defendant Association objected on the grounds that this waiver had not been pleaded. The trial Judge took the view that this waiver was evidentiary and so clearly a part of the history of 1927 financial arrangement of the Gibsons that it was not necessary to plead it, but, should there be doubt upon this point, allowed the plaintiff to amend to allege this instrument.

None of the defendants offered any testimony and, at the conclusion of the plaintiff's evidence, the defendant moved for a directed verdict. The jury was discharged and the plaintiff likewise moved for a directed verdict in its favor. The Court was first inclined to grant the motion in behalf of the defendant but, after reflection, during the noon recess, his Honor announced that the view expressed by him in the morning session was in error, and found for the plaintiff the amount mentioned in the waiver (Exhibit E) "not so much on the two-fund doctrine as on this instrument." The decree was then entered.

Appellants state issues raised by exceptions are:

1. Application of the two-fund doctrine.

2. Error in the admission of evidence offered by plaintiff, over objection of the two bank defendants.

3. Error of the Court in allowing plaintiff to amend its complaint in accordance with said evidence.

4. Error of the Court in granting judgment in favor of the plaintiff in accordance with its amended complaint.

5. Error of the Court in allowing plaintiff to add to said judgment interest on same for about a year and a half previous to date of said judgment.

6. Error of the Court in his final refusal to grant judgment in behalf of the two bank defendants.

7. Error of the Court in his construction as placed upon the release admitted in evidence over objection of the two bank defendants. On pages seventeen, eighteen, and nineteen of the case we find this release:

"Know all Men by These Presents: That whereas, E. W. Gibson, on the 12th day of April, 1927, executed to the South Carolina Agricultural Loan Association a certain mortgage securing the payment of the full and just sum of Fifteen Thousand Six and 06/100 ($15,006.06) Dollars, the same being a third mortgage covering certain crops, as is more particularly described therein, and recorded in the office of the Clerk of Court for Chester County, in Mortgage Book 249, page 21, and

"Whereas, the said mortgage was subsequently assigned to the Federal Intermediate Credit Bank of Columbia, S. C., by the said South Carolina Agricultural Loan Association, and

"Whereas, it is desired by the said E. W. Gibson, to obtain from the Catawba Fertilizer Company certain Calcium Arsenate and Dusting Machinery,

"Now, therefore, in consideration of the said Catawba Fertilizer Company furnishing to the said E. W. Gibson Calcium Arsenate and Dusting Machinery to the value of not exceeding Nine Hundred ($900.00) Dollars, the said Federal Intermediate Credit Bank of Columbia, S. C., and the said South Carolina Agricultural Loan Association hereby release the lien of their mortgages for Fifteen Thousand Six and 06/100 ($15,006.06) Dollars, which mortgage is a third mortgage in favor of the said Catawba Fertilizer Company to the extent of Nine Hundred ($900.00) Dollars only and hereby agree that the said Nine Hundred ($900.00) Dollars hereinabove mentioned shall be paid prior to the payment of the Fifteen Thousand Six and 06/100 ($15,006.06) Dollars mortgage; it being the intent and purport of this instrument to make the Nine Hundred ($900.00) Dollars a second mortgage, equal in rank to the one now held by the Catawba Fertilizer Company, and the same shall in no manner affect the first mortgage covering said crops heretofore executed by the said E. W. Gibson.

"In witness whereof, the Federal Intermediate Credit Bank of Columbia, S. C., by H. G. Arnold, its President, and the South Carolina Agricultural Loan Association, by F. E. Hinnant, its Manager, have hereunto set their hand and official seals at Columbia, S. C., this 23rd day of August, 1927.

"Federal Intermediate Credit Bank of Columbia, S. C., by Howard C. Arnold, its President.

"South Carolina Agricultural Loan Association, by F. E. Hinnant, its Manager.

"Signed, Sealed and Delivered in the presence of:
>
> "Eoline Stack,
>
> "Mildred Sheppard."

It is conceded that the respondent had a mortgage on the crops, but not on the stock. The crops brought $2,000.

It is the office of a pleading to allege the ultimate facts to be established, and not the evidence to establish them. *Jones v. Atlantic Coast Lumber Corporation,* 92 S. C., 418, 75 S. E., 698.

Evidentiary facts need not be pleaded in order to be admissible in evidence. *Black v. State Company,* 99 S. C., 432, 83 S. E., 1088.

Section 192 of the Code of Civil Procedure of 1912, says that "The complaint shall contain:  *  *  *  A plain and concise statement of the facts constituting a cause of action, without unnecessary repetition." The only fault that can be found with the plaintiff's complaint is that it lacks conciseness, and contains too much repetition. He stated the facts constituting his cause of action. The order of the Circuit Court requires him to add allegations of law, to wit, whether his action is legal or equitable, that is, whether it is an action on the note set out in the complaint, or an action on the note and equitable mortgage alleged in paragraph 3 of the complaint, and for the foreclosure thereof; also, the manner in which said written instrument is claimed to give the plaintiff a lien. These are the questions for the Court. The order also required him to set forth in the complaint at least a part of the evidence upon which he relies to prove the facts alleged. Evidentiary matter ought not to be set out in the pleadings. They should contain only allegations of facts— naked—accompanied by as few modifying adjectives as the exigencies of the case will permit.

Defendant knows, or ought to know, what instruments he gave plaintiff. If he has forgotten their terms, the Code of Procedure provides a method whereby he may obtain an

inspection and copy them. *Bell v. Jackson*, 93 S. C., 556, 78 S. E., 679, at page 681.

The trial Court properly admitted the instrument. The defendants by their answer admitted paragraphs 6 and 7 of the complaint, in which was alleged the execution and delivery of the August mortgage. No particular kind of action was denominated in the complaint. The plaintiff merely sets forth all facts and circumstances, and asserted its rights to a part of the money collected by the defendants under the facts and circumstances set forth in the complaint. The defendants well knew that the waiver was required before the August mortgage was given.

The defendants cannot claim surprise. The instrument, Exhibit E, was executed by both Association and Bank. It was prepared by their attorney in Columbia. Although all the 1927 negotiations had been with Judge Peurifoy, president of the S. C. Agricultural Association, the defendants did not even have him present at the trial, nor did they account for his absence. The record clearly indicates they never intended offering any testimony, knowing that the plaintiff's showing as to the facts could not be controverted. The facts alleged in the complaint are sufficient to justify the decree.

There can be only one practical and sensible interpretation of the waiver. This is that the Association and Bank agreed substantially that they would waive the strict construction of the two-fund doctrine, that the principal creditor should suffer no loss to this extent—that the $884.32 mortgage be paid in full before any payment be made on the mortgage for $15,006.06. The instrument waived the rights of the Association for its full protection under the rule. Its mortgage for $15,006.06 was released for the full payment of the $884.32 mortgage. The defendants contracted to set aside the qualifying protection of the two-fund doctrine, whereby the primary creditor is normally paid in full. It specifically agreed that the $884.32 mortgage be paid in full. The Association and Bank knew that the only source of

payment would be the proceeds of the sale of the stock and crops of the Gibsons. The defendants, better than anyone, knew the precarious financial condition of the Gibsons.

The Fertilizer Company by advancing the guano and arsenate saved the defendant from making, in 1927, advances of $5,884.32. All of this was to the advantage of the defendant Association and Bank. It had been reimbursed all of its 1927 mortgage from the sale of lint cotton in the sum of $5,000. The plaintiff had received only $2,084.29 of its advances.

The Court did not err in allowing amendment under the circumstances. *Jordan v. Jordan,* 130 S. C., 330, 125 S. E., 910.

"Where the amendment of the complaint does not change the nature of the cause of action but conforms the allegations to the proof, it is entirely within the discretion of the Circuit Judge to allow it." *Sumter County Duroc Stock Farm v. Du Bose,* 127 S. C., 551, 121 S. E., 673.

A motion during trial to amend pleadings to conform to the proof should not be denied, where the amendment does not work a surprise on the opposing counsel. *Adams v. South Carolina & G. E. R. Co.,* 68 S. C., 403, 47 S. E., 693.

In allowing a plaintiff to amend complaint to allege a note under seal in lieu of a promissory note in rescinding an order of nonsuit, the Court held that the Court had power to correct any error during the term in which it occurred, and that the amendment to the complaint was properly allowed as there had been no denial of a material allegation, and no failure of proof, only a variance between the proof and an allegation of the complaint. *Moore v. Christian,* 31 S. C., 337, 9 S. E., 981.

See, also, the following provision of the Code:

Section 436, 1922 Code, Volume 1.

A different cause of action was not set up. The plaintiff claimed that it had a right to part or all of the $2,025 received from the live stock. These were the only funds avail-

able with which to pay the $884.32, according to the August waiver. The complaint sets forth the execution of all mortgages, including the August mortgage, and makes claim under the facts as alleged for this sum of money. It is not confined to a legal conclusion denominated two-fund doctrine. It may claim it under the circumstances surrounding the execution of the mortgage set forth in paragraphs 6 and 7 of the complaint. Just under what facts the plaintiff could recover this mortgage from the defendants was a matter of evidence and the best evidence was this particular instrument executed by the defendants and not by a third party, not an instrument of which the defendants had no knowledge, but an instrument which the defendants had executed and delivered to the plaintiff.

I see no error as complained of.

MR. JUSTICE BLEASE concurs.